

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-21-1994

# Filippo v. Bongiovanni, et al.

Precedential or Non-Precedential:

Docket 93-5658

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Filippo v. Bongiovanni, et al." (1994). *1994 Decisions.* Paper 89.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/89

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 93-5658

————————————

JOSEPH SAN FILIPPO, JR.

Appellant
v.

MICHAEL BONGIOVANNI, ANTHONY S. CICATIELLO,
ADREIENNE S. ANDERSON, DONALD M. DICKERSON,
FLOYD H. BRAGG, NORMAN REITMAN, individually
and as members of the Board of Governors of
Rutgers University, RUTGERS UNIVERSITY

Appellees

RUTGERS COUNCIL OF AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Amicus Curiae

————————————

On Appeal From the United States District Court
for the District of New Jersey
(D.C. Civil No. 88-2575)

————————————

Argued: May 13, 1994

Before: BECKER AND LEWIS, Circuit Judges
and POLLAK, District Judge[0].

(Filed July 21, 1994)

LEON FRIEDMAN (Argued)
148 East 78th Street
New York, NY 10021

Attorney for Appellant

---

[0]Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

  JOHN J. PEIRANO, JR. (Argued)
LINDA B. CELAURO
Carpenter, Bennett & Morrissey
100 Mulberry Street
Three Gateway Center
Newark, NJ  07102

        Attorney for Appellee

DENISE REINHARDT
Reinhardt & Schachter
744 Broad Street
Suite 2500
Newark, NJ 07102

                Attorney for Amicus Curiae
                _____

                OPINION OF THE COURT

                _____


POLLAK, District Judge.

        This case, brought under 42 U.S.C. §1983, arises out of the dismissal by

University -- New Jersey's principal state institution of higher education -- of pl

Dr. Joseph San Filippo, who was, until May 13, 1988, a tenured professor of chemist

The defendants named in this case are Rutgers University and six members of the Rut

Board of Governors (hereinafter collectively described as "Rutgers").  The district

granted Rutgers' motion for summary judgment and dismissed Professor San Filippo's

        On appeal, San Filippo, with support from the Rutgers Council of American

Association of University Professors Chapters ("Rutgers AAUP") as amicus, challenge

district court's grant of summary judgment in Rutgers' favor:  (1) on San Filippo's

that he was dismissed in retaliation for the exercise of his first amendment rights

(2) on San Filippo's claim that Rutgers violated his right to procedural due proces

because the panel that recommended his dismissal had, according to San Filippo, a

financial incentive to recommend dismissal.

        Part I of this opinion outlines the factual background and procedural his

this case.  Part II analyzes the legal issues posed by San Filippo's first amendmen

claim.  Part III addresses San Filippo's due process claim.

3

# I.         Factual background and procedural history

Because San Filippo appeals from the district court's grant of Rutgers' m[otion] for summary judgment, the following factual recital accepts as true all evidence pr[esented] by non-movant San Filippo, with all reasonable inferences drawn in his favor.

On November 25, 1985, Dean Tilden Edelstein told San Filippo and his Rutg[ers] AAUP counsellor, Wells Keddie,[0] of allegations that San Filippo had harassed, explo[ited] and attempted to exploit visiting scholars from the People's Republic of China. On January 6, 1986, Dean Edelstein sent San Filippo a letter stating the complaints ag[ainst] him. As required by one of the University's dismissal regulations, advice about wh[ether] dismissal proceedings should be commenced was sought from two groups of San Filippo['s] faculty peers and three academic officers of the University. On February 14, 1986, [the] tenured faculty members of the chemistry department passed a resolution concluding [that] the charges against San Filippo, if proven, represented grounds for dismissal. Aft[er the] Appointments and Promotion Committee, the University Provost, and the Chief Academi[c] Officer concurred in the sentiment expressed in that resolution, Rutgers University['s] President Edward Bloustein wrote a letter to San Filippo, dated October 1, 1986, i[n which] he described the formal charges against San Filippo. President Bloustein further indicated that, if San Filippo did not make a timely request for a hearing, Preside[nt] Bloustein would recommend to the University's Board of Governors that San Filippo b[e] dismissed based on the charges outlined in the letter.

San Filippo exercised his right to a hearing before a panel of five facul[ty] peers (the "Senate Panel") which, after a forty-six day hearing, concluded that San[Filippo had committed almost all of the offenses charged. In a forty-four page rep[ort] issued on December 21, 1987, the Senate Panel recommended that San Filippo be strip[ped]

---

[0]The Rutgers AAUP is the recognized agent for collective bargaining under state law [for] Rutgers University faculty members, including Professor San Filippo. The Rutgers A[AUP,] an affiliate of the national organization, also serves as a professional organizati[on for] the Rutgers University faculty.

his tenure and dismissed from the University. The Board of Governors unanimously concluded in its sixty-page opinion that the Senate Panel's findings were supported evidence. On May 13, 1988, the Board of Governors voted to dismiss San Filippo on basis of nine charges of misconduct. One member of the seven-member Board --Walter Wechsler -- voted against dismissal because he believed that the sanction was too s Wechsler has not been named as a defendant.

San Filippo filed the instant action on June 13, 1988. He alleges, among things, that disciplinary proceedings were initiated against him and that he was di in retaliation for the numerous (1) grievances and lawsuits he had instituted, and complaints he had voiced, against Rutgers University and various University officia between 1977 and 1986 -- activities that he contends are protected by the first ame

A.        San Filippo's alleged protected activities

In 1977, San Filippo wrote a letter to the then chemistry department chai Professor Sidney Toby, complaining about dangerous conditions in the chemistry laboratories, conditions that had been described by the New Jersey Department of He "generally unsatisfactory." In 1979, in response to a newspaper reporter's questio concerning a student's collapse due to noxious fumes during a chemistry experiment, Filippo stated -- as reported by the newspaper on January 30, 1979 --that undergrad students were being subjected to a "health hazard and an absolute danger" and that "minimum safety requirements are not being met." San Filippo was berated by the th department chairman, Professor Joseph Potenza, and by an administrator for making t comments. San Filippo's comments led to the creation of an American Association of University Professors – University Safety Committee.

In 1977 and 1978, San Filippo testified before a grand jury regarding an investigation into the manufacture of illegal drugs in the chemistry laboratories.

Potenza criticized San Filippo for his "disloyalty" and for "washing the department

dirty linen in public."

In 1983-84, San Filippo became embroiled in a dispute over what he descri

an effort by members of the chemistry department's instruments committee to obtain

funding for a mass spectrometer by misrepresenting the department's need for such a

instrument. San Filippo threatened to tell the federal funding agency the truth ab

department's needs. The committee members wrote a memorandum to Potenza, as depart

chairman, protesting San Filippo's threats to undermine their efforts to obtain a m

spectrometer. Potenza told San Filippo that he intended to place the memorandum in

Filippo's personnel file. San Filippo contacted the United States Attorney's offic

regarding this action against him, and an Assistant United States Attorney told San

Filippo that such an action would be characterized as an effort to obstruct justice

San Filippo told Potenza what the government lawyer had said, Potenza had the lette

reprimand removed from San Filippo's personnel file.

Between 1979 and 1986, San Filippo complained about certain financial

irregularities in the chemistry department, particularly efforts to divert funds fr

Filippo's federal grants. In October 1985, San Filippo objected to a proposal by t

department chairman, Professor Robert Boikess, to impose a "shop user's fee," which

Filippo characterized as illegal double billing of chemistry department members.

In 1981, the chemistry department declined to recommend San Filippo for

promotion to full professorship. San Filippo filed a grievance in 1982, contending

he had been denied promotion through manipulation of his promotion packet. While t

grievance was pending, the chemistry department recommended that San Filippo be pro

to full professor, effective July 1984. Although the grievance committee ultimatel

agreed with San Filippo that he should have been promoted, the University took the

position that the issue was moot. In September 1985, San Filippo filed a lawsuit i

6

court in which he contended that he was entitled to have his promotion effective Ju

1982. That suit is still pending.

In 1984, San Filippo grieved the fact that he had been denied a merit sal

increase.  The University rejected San Filippo's grievance, and he filed for non-bi

arbitration. The first hearings in the arbitration occurred in October 1985. On Sep

10, 1986, Boikess testified for the University. Regarding this event, the arbitrato

commented in his decision dated December 26, 1986:

> Little things are often very revealing.  A transcript does not conve
> full flavor of what transpires in the hearing room.  Boikess was called o
> last day of the hearing.  He brought his own lawyer with him (Mr. Peiran
>
> San Filippo cordially greeted him before he took the stand.  Boikess
> not acknowledge the greeting and refused to acknowledge grievant's presen
> the room.
>
> During his testimony, Boikess kept referring to grievant's "self-
> nomination" [for the merit salary award].  His tone of voice was so caust
> it sparked an inquiry from me.  (The inference to be drawn by the tone of
> employed was that a "self-nomination" was somehow less worthy).
>
> I specifically asked Boikess why he emphasized "self-nomination."  B
> danced around the issue and did not really answer my question.  It became
> obvious that he would not answer, so I gave up.  Further, the tenor and t
> his testimony revealed his near-total contempt for San Filippo.
>
> I note in passing that most of the persons being considered were sel
> nominated.  The [merit salary award procedure] specifically provides for
>
> One would have to be a block of wood to fail to notice Dr. Boikess'
> complete distaste for Joe San Filippo.

(A.1155 n.21).  The arbitrator sustained San Filippo's complaint. He further noted

opinion:

> San Filippo testified, without contradiction, that he was criticized by
> administration officials for talking to the school newspaper about unsafe
> conditions in the laboratories.  [San Filippo] was chairman of the Safety
> Committee at the time.  A student took ill.  [San Filippo] was accused of
> "disloyal."  Putting aside the serious first amendment issues the episode
> (Pickering v. Board of Education, 391 U.S. 563), it seems to me that the
> to the health of the students outweighs any possible harm to the reputati

7

those in authority that disclosure of lab conditions might have created.
Further, there is a difference to [sic] loyalty to the institution and th
purposes it is supposed to serve and fealty to the individuals who may, a
given moment, occupy positions of higher authority in the organization.
is more important in the scheme of things: bruised feelings because the
is tough and demanding or personal safety? . . .

While not directly at issue, there was some unsettling evidence that [Dr.
Filippo's] promotion packet had been surreptitiously removed and unfavora
material secretly inserted. [Dr. San Filippo] had to bring successful gr
action to rectify the situation. It would appear that someone was willing
to extra-ordinary lengths to deny [Dr. San Filippo] professional advantag
That kind of conduct is similar to what happened to [Dr. San Filippo] in
[merit salary award] review.

[Dr. San Filippo's] nomination was clearly judged under separate "San Fil
rules" that were applicable to no one else.

. . . . I know a pipe job when I see one.

(A.1161 n.29).

In November 1985, Dr. San Filippo brought a libel action in state court a

three administrators who accused San Filippo of deliberately falsifying time report

relating to one of his technical assistants.

Finally, San Filippo brought a lawsuit in state court against the Univers

March 1986 complaining about, among other things, the University's decision to proh

without a hearing of any kind -- graduate student assistance in San Filippo's resea

program, because of the accusations against San Filippo.

B.      The charges and proceedings against San Filippo

As explained above, on October 1, 1986, President Bloustein brought forma

written charges against San Filippo. After a hearing before the Senate Panel, which

recommended dismissal,

the Board of Governors, which reviewed the findings of the Senate Panel for suffici

the evidence, concurred in the Senate Panel's findings sustaining the following cha

8

Charge 1:  Your treatment of scholars visiting from the People's Republic [of] China and a Chinese Teaching Assistant violated the standards of profess[ional] ethics required by all faculty members.  More specifically, your treatmen[t with] respect to these individuals, as set forth more fully in the attached doc[ument], is as follows:

a.  You took advantage of your professorial position and exploited Mr. He[ping] Gao and Mr. Changhe Xiao, both visiting scholars from the People's Repub[lic of] China, by directing them or leading them to believe that they had no choi[ce but] to perform domestic work for you, such as garden work and indoor and outd[oor] cleaning work during the period May through July 1985.[0]

c.  You exploited Messrs. Gao and Xiao by representing that they would be[en] provided health benefits coverage and that you would deduct $700.00 from [the] salary to be paid each of them in order to cover the costs of such benefi[ts]. Despite deducting such sums, you did not provide coverage to either Mr. G[ao or] Mr. Xiao.

d.  During the period of time that the above-named visiting Chinese schol[ars] were at Rutgers, you threatened and harassed those individuals by repeate[dly] stating that you would send them back to China and by directing abusive l[anguage] toward them.

e.  On or about March 31, 1986, you interrupted without sufficient cause [a] laboratory class being conducted by Teaching Assistant, Zong Ping Chen.  [You] continued that incident by treating her in an unprofessional, threatening [and] abusive manner, within the hearing of other individuals, including her st[udents].

Charge 2:  On or about July 8, 1985, you directed Mr. Changhe Xiao, who h[ad] injured himself while doing maintenance work at your house, to identify h[imself] as Mr. Peng Zhou in Middlesex Hospital in order to have Mr. Xiao covered [by] Peng Zhou's medical insurance.

Charge 3:  You encouraged and permitted individuals working under your di[rection] and supervision to submit false time reports and to make inappropriate ch[arges] against certain University accounts.  Specifically:[0]

b.  Ms. Marilyn Brownawell, who works directly under your supervision, su[bmitted] time reports for the week ending August 17, 1984.  She reported and was p[aid for] 40 hours of work for that period, charged against the Chemistry Departmen[t's] mass spectrometer account, even though you knew that she did not perform [any] work related to the mass spectrometer or indeed any compensable work for [you] of any kind during that period.[0]

---

[0]The Senate Panel found that charge 1(b) was unproven, and the Board concurred in t[his] determination.
[0]The Senate Panel did not sustain charge 3(a), and the Board concurred in this determination.
[0]Charge 3(c) was not sustained by the Panel, and the Board concurred in this determination.

9

Charge 4: You violated professional and academic standards and exploited
foreign visitors to the University by bringing to the University as post-
doctoral fellows Chinese scholars you knew did not have appropriate crede
and by charging stipends of such individuals, who did not possess doctora
degrees, to your NSF grant as post-doctoral fellows. Subsequently you sup
these individuals for admission to the graduate program in Chemistry, a f
which clearly established that they did not have the credentials to be po
doctoral fellows.[0]

Charge 5: During Fall 1985, you submitted an application for admission t
graduate program, including letters of reference, on behalf of Mr. Peng Z
one of the individuals referred to in #4 above. One of the letters of ref
submitted by you purportedly was written and signed by Liu Guozhi. In fa
that letter was not prepared by Liu Guozhi, and you had knowledge of the
and did not make it known when you submitted the letter.

Charge 6: On December 16, 1985, Professor Robert Boikess, Chair of your
department, specifically instructed you not to permit Mr. Peng Zhou, Mr.
Yuan Guo, or any other graduate student except those already associated w
your research group, to work in your laboratory, pending investigation of
allegations of exploitation and harassment lodged against you by visiting
Chinese scholars. Despite these specific instructions, you subsequently
permitted Cong-Yuan Guo, Zhen-min He, and Peng Zhou to perform work in yo
laboratory.

In the Board's opinion, the Board specifically found that the conduct described in

sustained charges 1(a), 1(d) and 1(e) was a serious enough breach of the role of fa

member that, even if those were the only sustained charges, there would be sufficie

cause for dismissal. Accordingly, on May 13, 1988, the Board directed that San Fil

dismissed from the University.

Board member Wechsler agreed with his colleagues' findings but felt that

dismissal was too severe a sanction: "Because this punishment is clearly out of pro

to his alleged wrongdoing, and quite possibly tainted by a long history of animus,

respectfully dissent." (A.322).


C.        The procedural history of this case

---

[0]The Senate Panel sustained this charge in regard to Mr. Peng Zhou, but not in rega
Mr. Cong-Yuan Guo. The Board concurred in both determinations.

10

On June 13, 1988, San Filippo filed this suit against the University and

Board members who voted in favor of his dismissal.  San Filippo sued under §1983 an

law, alleging that the dismissal violated his speech, petition, equal protection, a

process rights under the United States and New Jersey Constitutions, and violated h

common law contract rights.

Following the parties' cross-motions for summary judgment on a number of

the district court granted San Filippo's motion for partial summary judgment on his

that the regulations pursuant to which he was dismissed were void for vagueness.  S

Filippo v. Bongiovanni, 743 F. Supp. 327 (D.N.J. 1990).  The void-for-vagueness iss

certified for interlocutory appeal to this court; we reversed and remanded the case

further proceedings.  San Filippo v. Bongiovanni, 961 F.2d 1125, 1139-40 (3d Cir. 1

After the Supreme Court denied San Filippo's petition for certiorari, San Filippo v

Bongiovanni, 113 S. Ct. 305 (1992), the district court referred the remaining summa

judgment motions to a magistrate judge.

In his Report and Recommendation, the magistrate judge recommended that s

judgment be granted in defendants' favor on San Filippo's procedural due process cl

on his state law claims, but that summary judgment be denied on San Filippo's first

amendment/equal protection claim.[0]  Regarding the first amendment claim, the magist

judge first explained that this circuit uses a three-part test to assess a public

employee's claim of retaliation for having engaged in a protected activity. First,

plaintiff must show that he engaged in a protected activity.  Second, plaintiff mus

that the protected activity was a substantial factor motivating the dismissal decis

Finally, defendant may defeat plaintiff's claim by demonstrating that the same acti

---

[0]The parties agree that the analysis is the same under the first amendment and equa
protection claims.  From this point, we refer to these claims as the first amendmen
claim.

11

would have taken place even in the absence of the protected conduct.[0]  See Holder v

of Allentown, 987 F.2d 188, 194 (3d. Cir. 1993); Czurlanis v. Albanese, 721 F.2d 98

(3d Cir. 1983) (citing Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 283-87

(1977)).

With respect to the first prong of this test, the magistrate judge conclu

that, unlike speech generally -- which is protected under the first amendment only

addresses a matter of public concern -- San Filippo's lawsuits and grievances were

activities protected under the petition clause of the first amendment regardless of

whether they addressed matters of public concern.  The magistrate judge then noted

fact-finder could reasonably infer that San Filippo's protected conduct was a subst

factor motivating the decision to dismiss him from the University.  Finally, the

magistrate judge recommended that San Filippo be given the chance to conduct additi

discovery in order to rebut Rutgers' claim that San Filippo would have been dismiss

in the absence of his protected activities. Because the magistrate judge believed t

defendants had not yet made relevant discovery material available to San Filippo, t

magistrate judge recommended that summary judgment be denied under Rule 56(f) of th

Federal Rules of Civil Procedure.[0]

---

[0]The burden of persuasion shifts to Rutgers with respect to the third prong of this
In this respect, the retaliatory discharge test differs from the Title VII rule
established in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981), an
reaffirmed in St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742 (1993), where the b
of persuasion remains on the plaintiff even after he or she has proved a prima faci
and the employer need only articulate -- not prove -- a non-discriminatory reason f
actions.

[0]        Rule 56(f) states in relevant part:

        Should it appear from the affidavit of a party opposing the motion that t
        party cannot for reasons stated present by affidavit facts essential to j
        the party's opposition, the court may refuse the application for judgment
        order a continuance to permit . . . discovery to be had or may make such
        order as is just.

San Filippo did not object to the magistrate judge's recommendation that

be granted summary judgment on the state law claims.  Accordingly, in an opinion da

September 28, 1993, the district court accepted those recommendations and granted R

summary judgment on those claims.  San Filippo objected to the magistrate judge's

recommendation that Rutgers be granted summary judgment on his due process claim, a

argued that he was entitled to summary judgment on that claim or at least to furthe

discovery.  Rutgers objected to the magistrate judge's recommendation that summary

judgment on San Filippo's first amendment claim be denied.

The district court adopted the magistrate judge's recommendation that sum

judgment be granted on San Filippo's due process claim, but rejected the magistrate

judge's recommendation that summary judgment be denied on San Filippo's first amend

claim.  With respect to the first amendment claim, the district court first disagre

the magistrate judge's conclusion that San Filippo's lawsuits and grievances were

activities protected under the first amendment petition clause regardless of whethe

addressed a matter of public concern.  Instead, the district court held that lawsui

grievances, like speech generally, are protected activities under the first amendme

if they address matters of public concern.

The district court concluded that some of San Filippo's speech addressed

of public concern and was therefore protected under the first amendment.  The distr

court also concluded that a fact-finder could reasonably infer that San Filippo's

protected conduct was a substantial factor motivating his dismissal.  However, the

district court held that there was no basis in the record from which a fact-finder

reasonably conclude that San Filippo was dismissed because of his protected conduct

rather than because of the misconduct described in the charges brought against him.

Moreover, the district court rejected the magistrate judge's recommendation that a

on the summary judgment motion be delayed until after San Filippo had had an opport

to conduct additional discovery, and instead held that San Filippo had received all

discovery to which he was entitled.  Accordingly, the district court held that Rutg

entitled to summary judgment on San Filippo's first amendment claim as well as on h

process and state law claims, and dismissed San Filippo's complaint in its entirety

On appeal, San Filippo argues that the district court's order granting Ru

summary judgment on his first amendment claim should be vacated because the distric

erred, (a) in granting Rutgers' motion for summary judgment without affording him a

opportunity to take additional discovery, and (b) on the merits.  San Filippo also

contends that the district court's order granting Rutgers summary judgment on his d

process claim should be vacated because there remains a material issue of fact rega

the question whether the Senate Panel had a pecuniary interest in the outcome of th

proceedings against San Filippo, and because he was entitled to additional discover

## II.        San Filippo's first amendment claim

San Filippo first contends that the district court erred in denying his m

made pursuant to Rule 56(f) of the Federal Rules of Civil Procedure,[0] that the dist

court delay its ruling on Rutgers' summary judgment motion until after he had time

conduct further discovery.  San Filippo made various discovery requests on Septembe

1989; Rutgers asked to have until November 7 to respond.  On November 24, San Filip

wrote a 20-page letter to Rutgers pointing out inadequacies in Rutgers' response.

November 29, Rutgers moved for summary judgment and the requested information was n

supplied.  San Filippo submitted a Rule 56(f) affidavit in support of its oppositi

Rutgers' motion for summary judgment.  The magistrate judge recommended that the ru

the summary judgment motion be deferred until after San Filippo had an opportunity

additional discovery.

---

[0]The text of this rule is quoted at note 8, supra.

The district court rejected the magistrate judge's conclusion that summar[y] judgment should not be granted until San Filippo had an opportunity to discover add[itional] information. The court explained that San Filippo argued that "he must see the reco[rds of] other faculty persons similarly situated (i.e., persons who have been known to comm[it, or] were accused of committing, similar offenses, but against whom no sanctions, or not [as] severe a sanction was imposed)." Opinion at 42 (internal quotation omitted). The [court] rejected San Filippo's argument for two reasons. First, the court concluded that "[faculty] members 'similarly situated' to plaintiff are those faculty members against whom fo[rmal] charges have been filed as to conduct which could lead to dismissal under the Unive[rsity] regulations." Opinion at 42-43. The court explained that San Filippo received all [this] information on June 9, 1989, pursuant to Rutgers' compliance with section I.1 of a [        ] Stipulation dated May 19, 1989. Second, the court concluded:

> These [nine] charges together caused plaintiff's dismissal and it is only [a] tenured faculty member who had "been known to commit" or was "accused of committing" offenses of the kind, number, and scope taken together with w[hich] plaintiff is truly "similarly situated." No one suggests that such a per[son] exists.

Opinion at 44-45 (emphasis in original). For these two reasons, the court conclude[d that] San Filippo had received all of the discovery to which he was entitled. See Opinio[n at] 46.

San Filippo, with support from the Rutgers AAUP, argues that the district [court] abused its discretion in denying San Filippo's request for a Rule 56(f) continuance[.] Under Contractors Assoc. v. City of Philadelphia, 945 F.2d 1260 (3d Cir. 1991), whe[ther a] Rule 56(f) motion should be granted "depends, in part, on 'what particular informat[ion is] sought; how, if uncovered, it would preclude summary judgment; and why it has not b[een] previously obtained.'" Id. at 1266 (quoting Lunderstadt v. Colafella, 885 F.2d 66, [72 (3d] Cir. 1989)). A district court has discretion in acting on Rule 56(f) motions. See [         ]

15

1267.  However, where relevant information sought is in the hands of the moving par

district court should grant a Rule 56(f) motion almost as a matter of course unless

information is otherwise available to the non-movant."  Id.

In Contractors Assoc., the district court granted Contractors Association

Eastern Philadelphia and other trade associations summary judgment on their claim t

Philadelphia's public contract minority set-aside law violated the equal protection

of the fourteenth amendment.  On appeal, United Minority Associates Enterprises arg

that the district court --to which Minority Associates had submitted a Rule 56(f)

affidavit along with their opposition to summary judgment -- erred by granting the

judgment motion without giving Minority Associates an opportunity to pursue discove

the existence of discrimination in the Philadelphia construction market that could

various set-asides.  We held that the district court abused its discretion by not g

a continuance before ruling on the summary judgment motion.  See Contractors Assoc.

F.2d at 1268.

In addressing the first part of the Contractors Assoc. test -- what infor

is sought and how it would preclude summary judgment -- San Filippo and the Rutgers

argue that the district court's definition of "similarly situated" was too narrow.

agree.  Among other things, San Filippo argues that, but for his protected activity

would not have been charged at all.  To limit his discovery to individuals who were

fact brought up on similar charges is, therefore, not adequately responsive to San

Filippo's needs.  Nor should San Filippo be limited to discovery of individuals who

committed nine charges of comparable seriousness yet were not disciplined.  The Sup

Court explained in McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n.11 (

> [P]recise equivalence in culpability between employees is not the questio
> we indicated in [McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (197
> allegation that other "employees involved in acts against [the employer]
> comparable seriousness . . . were nevertheless retained . . ." is adequat

16

> plead an inferential case that the employer's reliance on his discharged
> employee's misconduct as grounds for terminating him was merely a pretext

Santa Fe, 427 U.S. at 283 n.11 (emphasis and omissions in Santa Fe).

In analogous fashion, this court, in Bennun v. Rutgers State University, F.2d 154 (3d Cir. 1991), rejected a contention that the district court had erred in comparing the defendant University's decision not to tenure the plaintiff professor the University's decision to tenure another professor who had higher ratings than t plaintiff in two categories -- teaching effectiveness and general usefulness. See 178. We reasoned that to preclude such a comparison "would change 'similarly situa 'identically situated.'" Id. Although "[t]he propriety of such a comparison is cas specific," there is a "broad sweep of relevancy." Id. Admittedly, the district cou and should impose limits on discovery that is calculated to lead to the unearthing marginally relevant evidence. Nonetheless, the limits imposed here were too severe

The Board indicated in its opinion that it viewed charges 1(a), 1(d) and the most serious charges against San Filippo, meriting his dismissal even if the ot charges were not sustained. San Filippo accordingly should be permitted to discove whether the University knew of other employees who committed one or more offenses o comparable or greater seriousness yet did not discipline these employees, or impose sanctions far less severe than dismissal. Although the district court's suggestion San Filippo was disciplined because of a combination of misdeeds rather than for an single misdeed is plausible, this type of evaluation is one that should generally b to the fact-finder. Because the information San Filippo sought in discovery was of sort that might prevent the entry of summary judgment and was under the control of Rutgers, we conclude that it was an abuse of discretion to deny San Filippo's Rule

17

motion. Accordingly, we will vacate the district court's grant of summary judgment

Filippo's first amendment claim and remand for further discovery.[0]

Even without further discovery, there is sufficient evidence in the recor

which a fact-finder could conclude that, in the absence of his protected activities

Filippo would not have been dismissed based on the conduct described in the charges

against him. First, Dean Edelstein was interviewed by the local New Brunswick news

The Home News, shortly after San Filippo was dismissed. The paper reported: "'If

Filippo] had behaved better earlier in terms of his relations with his colleagues,'

Tilden Edelstein, Dean of the Faculty of Arts and Sciences, San Filippo might have

treated differently. . . . 'But San Filippo persisted in being "Joe the Warrior,"'

Edelstein said." (A.606). A fact-finder could reasonably infer that the "war" to w

Dean Edelstein referred encompassed the protected complaints San Filippo had made o

years. In addition, Walter Wechsler, the member of the Board of Governors who diss

from the decision to dismiss San Filippo, stated that "the punishment is clearly ou

proportion to his alleged wrongdoing, and quite possibly tainted by a long history

animus." (A.322).

San Filippo also has presented evidence that other faculty members had co

infractions of comparable seriousness yet had not been punished. For example, Prof

Richard Hartwick of the chemistry department testified before the Senate Panel that

had two students pitch hay for him on his farm. Another professor, George Muha, te

that, as a student, he had helped his faculty advisor move from one place to anothe

Professor Muha also testified that he had some of his own students work with him in

photography lab, and that foreign students he had invited to his house at Thanksgiv

[0]With respect to the second part of the Contractors Assoc. test -- why the informat
not previously obtained --Rutgers argues that the May 19, 1989 Stipulation preclude
further discovery. This argument is unpersuasive. We agree with the district cour
conclusion that the Stipulation did not necessarily foreclose additional discovery.

18

domestic chores including yard work for him.  Based on this evidence, a fact-finder

reasonably find that San Filippo would not have been dismissed in the absence of hi

protected activities.  Accordingly, even if the denial of the Rule 56(f) motion wer

erroneous, we would vacate the grant of summary judgment.

In light of our decision to vacate the district court's grant of summary

judgment on San Filippo's first amendment claim, we need to address certain other i

that are relevant to the course of proceedings on remand.

A.        Protected activity

As explained above, one who alleges retaliatory discharge from government

employment must establish that the conduct which triggered the discharge was protec

under the first amendment.  Where the alleged retaliation is based on expressive co

constituting speech, a court must first determine whether or not the speech can be

characterized as addressing a "matter of public concern," for a governmental employ

makes public complaints about problems not of "public concern" has no first amendme

immunity against employer discipline.  Connick v. Myers, 461 U.S. 138, 147 (1983).[0]

San Filippo's expressive conduct was not limited to speech.  It included the filing

of lawsuits, and also of grievances under a collective bargaining agreement, agains

---

[0]A public employer is not precluded altogether from dismissing an employer for spee
addressing a matter of public concern.  Rather, a public employer may dismiss an em
for speech addressing a matter of public concern if the state's interest, as an emp
in promoting the efficiency of its operations outweighs the employee's interest, as
citizen, in commenting upon matters of public concern.  Connick, 461 U.S. at 142.
balancing test comes into play only if the public employer concedes that it dismiss
employee because of the employee's protected speech but contends that it was justif
doing so.  Rutgers denies that it dismissed San Filippo for his protected activitie
accordingly, the balancing test has no application in the case at bar.

The court decides, as a matter of law, whether the speech at issue addres
matter of public concern and whether the state's interest in efficiency outweighed
employee's interest in commenting on matters of public concern.  See Holder v. City
Allentown, 987 F.2d 188, 195 n.2 (3d Cir. 1993).

University and University officials —- activities that implicate the petition claus[e]
rather than the free speech clause, of the first amendment.[0]

The magistrate judge concluded that San Filippo's activities implicating [the]
petition clause were protected by the first amendment regardless of whether the "pe[tition]
at issue addressed a matter of public concern.  The district court disagreed, and h[eld]
that, to qualify for first amendment protection, San Filippo's "petition" activitie[s must]
meet the Connick "public concern" threshold.  Although the district court concluded [that]
some of San Filippo's speech addressed matters of public concern,[0] the court conclu[ded]
that his lawsuits and grievances did not meet that threshold.

On appeal, San Filippo and the Rutgers AAUP recognize that the right to
petition, like freedom of speech, is not absolute.  They argue that San Filippo's l[awsuits]
and grievances were protected first amendment activities, regardless of content, un[less]
they were baseless.  Rutgers contends that the district court correctly held that S[an]
Filippo's lawsuits and grievances were protected under the petition clause only if [they]
addressed matters of public concern.[0]

---

[0]The first amendment states in relevant part:

> Congress shall make no law . . . abridging the freedom of speech, or of t[he]
> press, or of the right of the people peaceably to assemble, and to petiti[on the]
> Government for a redress of grievances.

United States Constitution, Amend. 1.

[0]The district court concluded that the following items of speech addressed matters [of]
public concern:  (1) San Filippo's 1979 statement in a school newspaper criticizing
Rutgers for inadequate ventilation in the chemistry labs; (2) San Filippo's testimo[ny, in]
1977 and 1978, before a grand jury, regarding an investigation into the manufacture [of]
illegal drugs in Rutgers' laboratories; (3) San Filippo's criticisms, in 1983-84, o[f his]
faculty peers' attempt to secure funding for a mass spectrometer by deceiving feder[al]
funding agencies; and (4) San Filippo's disputes between 1979 and 1986 with senior [members]
of his department over their efforts to obtain "inappropriate percentages" of his f[unding]
grants.

[0]The district court's conclusion that San Filippo engaged in some protected activit[ies does]
not make this dispute academic.  San Filippo wants, (a) the fact-finder to be instr[ucted]
that dismissal in retaliation for any or all of his lawsuits and grievances consti[tuted a]
first amendment violation, and (b) to argue to the fact-finder that the close proxi[mity]

20

In <u>Bradley v. Pittsburgh Bd. of Educ.</u>, 913 F.2d 1064 (3d Cir. 1990), we expressly declined to reach the question whether a public employee is protected un[der] petition clause against retaliation for having filed a petition addressing solely a[...] of private concern. <u>See id.</u> at 1076. We now will address that question.

Although the Supreme Court has not discussed the scope of the constitutio[nal] right to petition in the context of an allegedly retaliatory discharge of a public[...] employee, the Court has had occasion to consider the scope of that right in other[...] contexts.

In <u>Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U[.S.] (1961), the Court addressed the question whether a publicity campaign by railroads[...] intended to encourage legislation and law enforcement practices disadvantageous to[...] trucking industry violated the Sherman Act. First, the Court took note of the esta[blished] principle that, if a restraint of trade is caused by otherwise valid governmental a[ction,] there is no Sherman Act violation. <u>See id.</u> at 135-36. Then, the Court went on to[...] that the Sherman Act does not prohibit two or more persons from working together in[...] attempt to persuade the government to take a particular action that would restrain[...] <u>See id.</u> at 136. The Court based its decision upon two grounds. First, the Court n[oted] that nothing in the legislative history of the Sherman Act indicated an intent to r[...] political activity by narrowing the channels through which citizens communicate wit[h] governing officials. <u>See id.</u> at 137. The Court then added:

> Secondly, and of at least equal significance, such a construction of the [Sherman]
> Act would raise important constitutional questions. The right of petiti[on is]
> one of the freedoms protected by the Bill of Rights, and we cannot, of co[urse,]
> lightly impute to Congress an intent to invade these freedoms.

---

time between his 1985 lawsuits and the decision to file formal charges against him[...]
supports an inference of retaliation.

Id. at 138.  Moreover, the Court rejected the contention that there was a Sherman A

violation because the railroads' purpose was to destroy the truckers as competitors

> There may be situations in which a publicity campaign, ostensibly directe
> toward influencing governmental action, is a mere sham to cover what is a
> nothing more than an attempt to interfere directly with the business
> relationships of a competitor and the application of the Sherman Act woul
> justified.  But this is certainly not the case here.  No one denied that
> railroads were making a genuine effort to influence legislation and law
> enforcement practices.

Id. at 144.  Accord, United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965).[0]

In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (19

the Court developed the "mere sham" exception to petition clause protection suggest

the Noerr dictum.  Competitors of highway carriers regularly brought administrative

judicial proceedings to challenge the carriers' applications for operating rights.

highway carriers filed a complaint alleging that their competitors conspired to mon

trade by instituting actions before administrative agencies and courts to defeat th

carriers' applications to acquire operating rights.  See id. at 509.  The complaint

further alleged that the competitors instituted the proceedings to oppose the carri

applications without regard to the merits of the cases, in an effort to prevent the

carriers from having meaningful access to the agencies and courts.  See id. at 511.

Supreme Court held that the district court improperly dismissed the complaint for f

to state a claim under the antitrust laws.  The Court first reiterated the holding

Noerr that "no cause of action [is] alleged insofar as it [is] predicated upon mere

attempts to influence the Legislative Branch for the passage of laws or the Executi

Branch for their enforcement."  Id. at 510.  The Court further stated:

---

[0]In Pennington, coal operators and a labor union had approached the Secretary of La
the Tennessee Valley Association regarding the minimum wage for contractors selling
to the TVA.  The Court reaffirmed the holding of Noerr that "[j]oint efforts to inf
public officials do not violate the antitrust laws even though intended to eliminat
competition." 381 U.S. at 670.

22

> The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and of the executive) and to courts, the third branch of Government. The rig access to the courts is indeed but one aspect of the right of petition.
>
> We conclude that it would be destructive of rights of association an petition to hold that groups with common interests may not, without viola the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respectin resolution of their business and economic interests vis-a-vis their compe

Id. at 510-11 (citations omitted). Nonetheless, the Court held that the conduct de in the carriers' complaint fell within the "sham" litigation exception described in and thus stated a claim under the antitrust laws.

The unprotected status of "sham litigation" was again recognized in Bill Johnson's Restaurants Inc. v. NLRB, 461 U.S. 731 (1983), in which the Court announc "baseless litigation is not immunized by the First Amendment right to petition." I 743. In Bill Johnson's Restaurants, a waitress who was fired filed an unfair labor practice charge. She and other waitresses also picketed the restaurant, which in tu filed a complaint in state court seeking both damages and an injunction against the picketing. The waitress then filed a second charge with the Board, alleging that t restaurant had filed the state action in retaliation for her exercise of rights und National Labor Relations Act and seeking to have the restaurant's state action enjo The Board issued a cease-and-desist order to halt the allegedly retaliatory state c lawsuit, and the Ninth Circuit affirmed.

The issue before the Supreme Court was whether, under section 8 of the NI Board may issue a cease-and-desist order to halt a state court suit solely upon a s that the suit was filed for a retaliatory purpose, or whether the suit must also la merit. The Court recognized that the Board's position -- that the suit need only b for a retaliatory purpose -- found support in the broad remedial provisions of the However, the Court concluded:

23

There are weighty countervailing considerations . . . that militate again[st] allowing the Board to condemn the filing of a suit as an unfair labor pra[ctice] and to enjoin its prosecution. In California Motor Transport, we recogni[zed] that the right of access to the courts is an aspect of the First Amendmen[t] to petition the Government for redress of grievances. Accordingly, we co[nstrued] the antitrust laws as not prohibiting the filing of a lawsuit, regardless [of a] plaintiff's anticompetitive intent or purpose in doing so, unless the sui[t was a] "mere sham" filed for harassment purposes. We should be sensitive to the[se] First Amendment values in construing the NLRA in the present context.

Id. at 741 (citations omitted). The Court held that suits lacking a reasonable bas[is do] not fall within the scope of first amendment protection. The Court explained:

The first amendment interests involved in private litigation -- compensat[ion for] violated rights and interests, the psychological benefits of vindication, [the] airing of disputed facts -- are not advanced when the litigation is base[d on] intentional falsehoods or on knowingly frivolous claims. Furthermore, si[nce] sham litigation by definition does not involve a bona fide grievance, it [does] not come within the first amendment right to petition.

Id. at 743 (internal quotation omitted). Accordingly, the Court concluded that it [is an] enjoinable labor practice under §8 of the NLRA to file a baseless lawsuit with the [motive] of retaliating against an employee for the exercise of rights protected by the NLRA[.] id.[0]

In both Smith v. Arkansas State Highway Employees, 441 U.S. 463 (1979) (p[er] curiam) and Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 284 (198[4), the] Court held that the petition clause does not require the government to respond to e[very] communication that the communicator may denominate a petition. In Smith, the Arkan[sas] State Highway Commission refused to consider grievances filed by a union on behalf [of] employees, and would respond only to grievances filed by individual employees thems[elves.]

_____

[0]Following Bill Johnson's Restaurants in Hoeber on behalf of the NLRB v. Local 30, [939] F.2d 118 (3d Cir. 1991), this court held that the district court properly denied th[e] NLRB's request that the court enjoin a pending lawsuit brought by a labor union for [breach] of contract. We explained that two factors must be present before an injunction ag[ainst a] civil lawsuit may issue: the plaintiff must have an improper motive for bringing th[e suit] and the suit must have no reasonable basis. See Hoeber, 939 F.2d at 126.

24

In Knight, a state statute required public employers to respond to union representa[tives] but not to individual employees. In both cases, the Court held that there was no p[etition] clause violation. The Knight Court, which described the challenged conduct as the converse of conduct challenged in Smith, rejected the employees' claim that "they h[ad a] right to force officers of the State acting in an official policy-making capacity t[o] listen to them in a particular formal setting." Knight, 465 U.S. at 282.

Most recently, in McDonald v. Smith, 472 U.S. 479 (1985), the Court addre[ssed] the question whether the petition clause provides absolute immunity to a defendant [charged] with defaming the plaintiff in a letter about the plaintiff written to the Presiden[t of] the United States. Smith, an unsuccessful aspirant for appointment as United State[s] Attorney, brought a libel suit against McDonald, alleging that McDonald had writte[n two] letters to Ronald Reagan -- the first when Mr. Reagan was President-elect, the seco[nd a] month after his inauguration --accusing Smith of, among other things, fraud, extort[ion,] and civil rights violations. The Court held that the petition clause does not prov[ide] absolute immunity in that context; rather, a petitioner whose communications are defamatory may be answerable in libel if he is shown to have acted with malice, as [defined] in New York Times Co. v. Sullivan, 376 U.S. 254 (1964). In reaching this conclusi[on, the] Court observed:

> The right to petition is cut from the same cloth as the other guarantees [of that
> First] Amendment, and is an assurance of a particular freedom of expressi[on.]
> . .
>
> To accept petitioner's claim of absolute immunity would elevate the Petit[ion]
> Clause to special First Amendment status. The Petition Clause, however, [was]
> inspired by the same ideals of liberty and democracy that gave us the fre[edoms]
> to speak, publish, and assemble. These First Amendment rights are insepa[rable,]
> and there is no sound basis for granting greater constitutional protectio[n to]
> statements made in a petition to the President than other First Amendment
> expressions.

McDonald, 472 U.S. at 482, 485 (citations omitted).

25

As the arguments advanced in the briefs in the case at bar make clear, th

Supreme Court cases we have just canvassed, while long on nuance, do not yield an e

identified single common denominator.

San Filippo and the Rutgers AAUP would have us regard San Filippo's petit

activities protected under the first amendment unless those petitions were "mere sh

"baseless litigation."  They stress that none of the very narrow limitations the Su

Court has placed on the right to petition involves an examination of the content of

petition.  They also argue that the petitions at issue in Noerr and Pennington did

address matters of public concern, and therefore those cases implicitly rejected th

proposition that petitioning is protected under the first amendment only if the pet

addresses a matter of public concern.  The Rutgers AAUP contends that "there is eve

reason that the lines drawn around the right to petition in public employment be th

as those drawn for selfish petitioners everywhere."  That is, the Rutgers AAUP woul

us define the contours of the right to petition without consideration of the contex

which that right is exercised.

In contrast, Rutgers argues -- we think persuasively --that "[t]he nature

limitation upon the petition right depends upon context."  Rutgers contends that th

Supreme Court cases analyzing the extent of the petition right in the antitrust, la

and libel contexts are not necessarily instructive in the case at bar, which concer

ability of a government employer to dismiss an employee for filing lawsuits and gri

against the employer.  This argument that the scope of the petition right depends u

context in which the right is exercised is particularly persuasive because the scop

the free speech right -- a right that, like the petition right, is stated in unqual

terms in the first amendment --depends on the context in which that right is exerci

[0]San Filippo and the Rutgers AAUP rely upon cases from contexts other than public
employment/retaliatory discharge in support of the argument that a lawsuit is prote
regardless of content -- unless it is baseless.  Most significantly, San Filippo co
that our decision in Hoeber on behalf of the NLRB v. Local 30, 939 F.2d 118 (3d Cir

26

That the scope of the right to petition depends upon context does not, ho

mandate the further conclusion that the "public concern" threshold of <u>Connick</u> shoul

the right to petition in the context of a government employer's ability to discipli

public employee.  The general question posed by the case at bar is whether --

notwithstanding the dicta from <u>McDonald</u> quoted above -- there are contexts in which

petition clause protects values additional to those protected by the speech clause.

     <u>McDonald</u> is a case in which the petition clause protects no value that is

protected by the speech clause. The petition at issue in <u>McDonald</u> was a letter to t

President. <u>Smith</u> and <u>Knight</u> instruct that not every communication which the writer

denominates a "petition" imposes on the government agency or official addressed an

obligation to respond.  See <u>Knight</u>, 465 U.S. at 285; <u>Smith</u>, 441 U.S. at 465.  Accor

it is difficult to distinguish in any meaningful way between words contained in a l

to the President and words contained in, for example, an advertisement appearing in

<u>New York Times</u>.

This difficulty presumably was the underpinning of the <u>McDonald</u> Court's holding tha

McDonald's words about a public figure should not be immunized simply because they

appeared in a letter characterized as a "petition."  Moreover, the reasons for hold

---

forecloses Rutgers' position.  As explained in note 16, <u>supra</u>, in <u>Hoeber</u> we held,
following <u>Bill Johnson's Restaurants, Inc. v. NLRB</u>, 461 U.S. 731 (1983), that a cou
not enjoin a pending lawsuit as an unfair labor practice unless the plaintiff had a
improper motive for bringing the suit and the suit had no reasonable basis.  See <u>Ho</u>
939 F.2d at 126.  San Filippo argues that, because the breach of contract lawsuit a
in <u>Hoeber</u> appeared to address only matters of private concern, the case supports hi
argument that his lawsuits and grievances addressing only matters of private concer
protected under the petition clause.  We disagree.  Because this case does not aris
the public employment/retaliatory discharge context, it is not on point.
     Many other cases cited by San Filippo and the AAUP are similarly inapposi
because they arise in other contexts.  See, e.g., <u>Milhouse v. Carlson</u>, 652 F.2d 371
(3d Cir. 1981) (disciplinary proceedings allegedly brought against a prisoner in
retaliation for having filed a civil rights lawsuit); <u>Goff v. Burton</u>, 7 F.3d 734,
Cir. 1993) (same); <u>Smith v. Maschner</u>, 899 F.2d 940 (10th Cir. 1990) (same); <u>Wright</u>
<u>Newsome</u>, 795 F.2d 964 (11th Cir. 1986) (same); <u>Duvall v. Sharp</u>, 905 F.2d 1188 (8th
1990) (arrest allegedly made in retaliation for filing a civil rights lawsuit).

27

that the first amendment does not immunize maliciously defamatory falsehoods contai

a newspaper advertisement equally justify holding that the first amendment does not

immunize maliciously defamatory falsehoods contained in a letter to the President.

is no value in a petition that seeks to influence the President by means of false

statements.  As in the context of speech, the additional requirement that malice be

before liability may be imposed avoids overdeterrence.

The same difficulty in drawing a meaningful distinction between the speed

in the petition at issue in Schalk v. Gallemore, 906 F.2d 491 (10th Cir. 1990) (per

curiam) and other employee speech underlies the holding of that case.  Schalk, a ho

employee, had hand-delivered to the hospital board members a four-page letter descr

her concerns about various management practices at the hospital.  Schalk was formal

reprimanded for complaining about matters unrelated to her area of responsibility.

reprimand indicated that Schalk would be discharged if she made further complaints

nature.  After Schalk told a board member that she wanted to meet with the board to

discuss concerns akin to those described in her letter, she was terminated.  Schalk

filed a lawsuit alleging that she was fired for writing a letter to, and later spea

with, board members about management practices, in violation of her first amendment

and petition rights.

The Tenth Circuit first held that Schalk's letter and her comments to the

member addressed a matter of public concern.  Id. at 496.  In a brief analysis of S

petition clause claim, the court stated:  "In the instant case, Schalk's right to p

is inseparable from her right to speak.  As such, we see no reason to subject this

to a different sort of analysis."  Id. at 498 (citing McDonald).  As in McDonald, b

the "petition" at issue was simply a letter imposing on the government no obligatio

respond, it was properly analyzable under the conventional Connick rubric applicabl

speech.

28

The case at bar is unlike Schalk in the sense that what San Filippo characterizes as "petitions" are not letters to the government-employer, but lawsui grievances directed at the government-employer or its officials.  Submissions of th purport to invoke formal mechanisms for the redress of grievances.[0]  Notwithstandin distinction, each circuit court to consider the issue has held that a public employ alleges that he or she was disciplined in retaliation for having filed a lawsuit ag his or her employer does not state a claim under §1983 unless the lawsuit addressed matter of public concern.[0]  Recognizing that the question is a difficult one, we fi ourselves unable to subscribe to the reasoning of our sister circuits.

Of these circuits, the Seventh Circuit has addressed the issue in the mos detail.  In Altman v. Hurst, 734 F.2d 1240 (7th Cir. 1984) (per curiam), decided be McDonald, the Seventh Circuit held that a police officer who alleged that he was reassigned, denied overtime opportunities and otherwise harassed in retaliation for a lawsuit against his employer addressing matters of private concern did not state under §1983.  The court explained:

> Several Supreme Court cases indicate that the first amendment protects a
> person's right to seek judicial redress of grievances.  See NAACP v. Butt
> U.S. 415, 429.  A close reading of these cases clearly shows that the Cou

[0]Lawsuits, grievances, workers compensation claims, etc. share this feature of invo formal mechanism for redress of grievances against the government.  We occasionally the term "lawsuit" to encompass any device invoking a mechanism for redress of grie against the government.

[0]See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993); Da South Park Independent Sch. Dist., 768 F.2d 696, 703 (5th Cir. 1985), cert. denied, U.S. 1101 (1986); Rathjen v. Litchfield, 878 F.2d 836, 842 (5th Cir. 1989); Rice v. Ohio Dep't of Transportation, 887 F.2d 716, 720-21 (6th Cir. 1989), vacated other grounds, 497 U.S. 1001 (1990); Altman v. Hurst, 734 F.2d 1240, 1244 n.10 (7th 1984) (per curiam); Belk v. Town of Minocqua, 858 F.2d 1258, 1261-62 (7th Cir. 1988 Gearhart v. Thorne, 768 F.2d 1072, 1073 (9th Cir. 1985) (per curiam); Renfroe v. Kirkpatrick, 722 F.2d 714, 715 (11th Cir.) (per curiam), cert. denied, 469 U.S. 823 (1984).  Cf. Boyle v. Burke, 925 F.2d 497, 505-06 (1st Cir. 1991) (dicta). But see Fuchilla v. Prockop, 682 F. Supp. 247, 262 (D.N.J. 1987), (reading California Motor Transport to support the holding that a public employee may not be retaliated agai filing a lawsuit regardless of whether the lawsuit addressed a matter of public con

29

concerned about political expression and not the general right to bring s
a federal court of law.  See, e.g., Button, 371 U.S. at 429. ("In the cor
NAACP objectives, litigation is not a technique of resolving private
differences; it is a means of achieving the lawful objectives of equality
treatment by all government, federal, state and local, for the members of
Negro community in this county. It is thus a form of political expression
This formulation dovetails with the Connick rule that limits the first am
protection given public employees to pronouncements on public issues.  Th
private office dispute cannot be constitutionalized merely by filing a le
action.

Id. at 1244 n.10 (some citations omitted).[0]  That is, the Seventh Circuit explicitl

rejected the proposition that the petition clause protects access to the courts fo

reason other than that the courts may serve as fora for expression.  In Belk v. Tow

Minocqua, 858 F.2d 1258, 1261–62 (7th Cir. 1988), the Seventh Circuit relied on McD

as further support for its holding that a public employee may be terminated in reta

---

[0]The Seventh Circuit reiterated this sentiment in Yatvin v. Madison Metropolitan Sc
Dist., 840 F.2d 412 (7th Cir. 1988):

> The contention that every act of retaliation against a person who files c
> of wrongdoing with a public agency denies freedom of speech or the right
> petition for redress of grievances rests on the following syllogism:  lit
> is a method recognized by the Supreme Court, as in NAACP v. Button, 371 U
> 415, 429–31 (1963), for advancing ideas and seeking redress of grievances
> retaliation against one who institutes litigation (or its condition prece
> Title VII litigation, the lodging of charges with civil rights agencies)
> discourages litigation; therefore such retaliation invades a First Amendm
> right.  The weakness is the first premise, which is stated too broadly.
> litigation seeks to advance political or other ideas; litigation by the N
> seeking to eliminate public school segregation is an example.  And even w
> litigation has private rather than public objectives, communications desi
> acquaint individuals with their legal rights are within the scope of the
> Amendment.  But not every legal gesture -- not every legal pleading -- is
> protected by the First Amendment.  Remedies against baseless litigation c
> violate the First Amendment's right to petition; nor do laws aimed at det
> 'far out' suits by requiring the loser to pay the winner's legal fees.

Id. at 419 (citations omitted).  Because the court concluded that Yatvin's sex
discrimination claim against her employer had purely private objectives, the court
rejected Yatvin's claim that her employer's retaliation violated the petition claus
at 419–20.  This conclusion may, however, be regarded as dictum because the court a
held that Yatvin's first amendment claim was foreclosed by her failure to raise the
below with sufficient particularity.  See id. at 420.

30

for filing a grievance unless the grievance addressed a matter of public concern.

Belk court stated:

> Notwithstanding the central importance Connick attaches to the content of
> public employee's speech, Belk asks us to accord absolute first amendment
> protection, without regard to content, to any grievance a public employee
> or threatens to file.  Not only is there no legal or historical precedent
> such a stratification of first amendment freedoms, as McDonald suggests,
> such special treatment of the right to petition would unjustly favor thos
> through foresight or mere fortuity present their speech as a grievance ra
> than in some other form.

Id. at 1262 (emphasis in original).  Again, affording special treatment to speech f
a grievance is "unjust" only if no independent reason exists for affording special
protection to a mechanism for redress of grievances against the government.

There is an additional argument for testing a public employee's lawsuits
his or her employer by the Connick public concern threshold not made in the Seventh
Circuit cases: namely, that the governmental interests which led the Court to impos
public concern threshold on employee speech would appear to justify imposing a simi
threshold on employee lawsuits and grievances.  Under Connick, employers are able t
discipline their employees for speech unless the speech addresses a matter of publi
concern.  The rationale for this distinction is that it represents an effort to see
balance between the interests of the [employee], as a citizen, in commenting upon m
of public concern and the interest of the State, as an employer, in promoting the
efficiency of the public services it performs through its employees."  Connick, 461
at 142.  The Supreme Court recently elaborated on the basis for authorizing the gov
as employer to exercise broader power in regulating the speech of its employees tha
government as sovereign may exercise in regulating the speech of the general public

> [T]he extra power the government has in this area comes from the nat
> the government's mission as employer.  Government agencies are charged by
> with doing particular tasks.  Agencies hire employees to help do those ta
> effectively and efficiently as possible.  When someone who is paid a sala

31

that she will contribute to an agency's effective operation begins to say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the government in the example given above, fire the [high-ranking] deputy [who criticize state governor's legislative program] is not that this dismissal would so be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor just feels that a quieter subordinate would allow them to do this job more efficiently.

The key to First Amendment analysis of government employment decisio then, is this: The government's interest in achieving its goals as effec and efficiently as possible is elevated from a relatively subordinate int when it acts as sovereign to a relatively significant one when it acts as employer. The government cannot restrict speech of the public at large ju the name of efficiency. But where the government is employing someone fo very purpose of effectively achieving its goals, such restrictions may we appropriate.

Waters v. Churchill, 62 U.S.L.W. 4397, 4401 (May 31, 1994).

We recognize that employee lawsuits and grievances against a public emplo can, on occasion, be divisive in much the same way that employee speech can be. Nonetheless, we believe that there is an independent reason -- a reason of constitu dimension -- to protect an employee lawsuit or grievance if it is of the sort that constitutes a "petition" within the meaning of the first amendment.

The first amendment's petition clause imposes on the United States an obl to have at least some channel open for those who seek redress for perceived grievan Through its incorporation of the first amendment, the fourteenth amendment's guaran "liberty" imposes the same obligation on the states. Smith and Knight stand only fo proposition that neither the United States nor the several states are required to recognize as a "petition" whatever particular communication is so characterized by chooses to protest governmental acts or omissions. But when government -- federal state -- formally adopts a mechanism for redress of those grievances for which gove is allegedly accountable, it would seem to undermine the Constitution's vital purpo hold that one who in good faith files an arguably meritorious "petition" invoking t

32

mechanism may be disciplined for such invocation by the very government that in con

with the petition clause has given the particular mechanism its constitutional impr

We do not share the Seventh Circuit's apprehension that not applying the Connick "p

concern" standard to retaliatory dismissal of a public employee who files a "petiti

would constitute "special treatment of the right to petition [that] would unjustly

those who through foresight or mere fortuity present their speech as a grievance ra

than in some other form." Balk, 858 F.2d at 1262. As applied to communications th

not petitions, the Connick rule means that a public employee who goes public -- e.g

writing to The New York Times -- with an employment dispute that is not of "public

concern" runs the risk of being disciplined by her public employer for undertaking

public attention to a private dispute. But when one files a "petition" one is not

appealing over government's head to the general citizenry: when one files a "petit

one is addressing government and asking government to fix what, allegedly, governme

broken or has failed in its duty to repair.[0]

---

[0]Like the Seventh Circuit in Belk, our dissenting colleague draws comfort from the
Court's observation in McDonald that the first amendment right to petition and the
amendment "freedoms to speak, publish and assemble . . . are inseparable" and hence
is no sound basis for granting greater constitutional protection to statements made
petition to the President than other First Amendment expressions." 472 U.S. at 485
it is important to note that the Court's language in McDonald was addressed to a qu
very different from the question presented in Belk and the case at bar. In McDonal
question was whether one who was defamed in a letter was disabled from suing the le
writer by virtue of the fact that the letter was written to the President and thus
be characterized as a "petition" within the meaning of the first amendment. In hol
that the letter-writer was amenable to suit at the hands of the person defamed, und
same state law standards, compatible with New York Times v. Sullivan, 376 U.S. 254
that would have applied had the letter been written to a newspaper, the Court was n
called upon the consider the question presented in the case at bar -- namely, wheth
addressee of a "petition" (in McDonald, the President) could sanction the letter-wr
for pursuing a constitutionally charted pathway of communication with government.

It is also worthy of note that the letter-writer in McDonald apparently did not
the audience for his defamatory efforts to President Reagan. The letter-writer all
also saw fit to send copies of one or both of the letters to Senator Jesse Helms, t
members of the House of Representatives, and the then Director of the Federal Burea
Investigation, William Webster, as well as then Presidential Adviser Edwin Meese.
U.S. at 481.

One example of formal governmental adoption of a mechanism for redress of

grievances is entry into a collective bargaining agreement that provides for a grie

procedure. Another example of formal government adoption of such a mechanism is wai

sovereign immunity from suit in the courts of that sovereign.  If government could,

employer, freely discharge an employee for the reason that the employee, in order t

present a non-sham claim against the government-employer, invoked such a mechanism,

petition clause of the first amendment would, for public employees seeking to vindi

their employee interests, be a trap for the unwary -- and a dead letter.

The petition clause of the first amendment was not intended to be a dead

-- or a graceful but redundant appendage of the clauses guaranteeing freedom of spe

press.  To be sure, "the right to petition," as the Court noted in McDonald, "is cu

the same cloth as the other guarantees of that Amendment. . . ."  472 U.S. at 482.

the Court in McDonald also stressed that the right to petition "is an assurance of

particular freedom of expression."  Ibid.  More to the point, the right to petition

pedigree independent of --and substantially more ancient -- than the freedoms of sp

and press.  The Court pointed out in McDonald that "[T]he historical roots of the P

Clause long antedate the Constitution.  In 1689, the Bill of Rights exacted of Will

Mary stated: '[I]t is the Right of the Subjects to petition the King.'  1 Wm. & Mar

Sess. 2, ch. 2."  Ibid. [0]  But of particular moment for the issue before us is that

---

[0] The remote antecedents of the right of petition trace back to Magna Carta, chapter
which provides:

> . . . if we or our justiciar, or our bailiffs, or any of our servants
> shall have done wrong in any way toward any one, or shall have
> transgressed any of the articles of peace or security; and the wrong
> shall have been shown to four barons of the aforesaid twenty-five
> barons, let those four barons come to us or to our justiciar, if we
> are out of the kingdom, laying before us the transgression, and let
> them ask that we cause that transgression to be corrected without
> delay.

34

Parliament, in the Bill of Rights, not only declared the right of subjects "to peti

the King," but went on to provide that "all committments [sic] and prosecutions for

petitioning are illegal."  1 W. & M., 2d Sess., c. 2, § 5, 16 Dec. 1689.  The right

petition and its attendant, and indispensable, immunity from "committments and

prosecutions"[0] were, in the Court's felicitous phrase, "exacted of William and Mary

McDonald, 472 U.S. at 482, in 1689. That was precisely one hundred years before the

---

But of course the right lukewarmly acknowledged by King John was exercisable only b
barons.

[0]The critical importance of Parliament's declaration that it was "illegal" to penal
subject "for such petitioning" was made plain by Blackstone in his celebrated
Commentaries, the series of law books best known to American lawyers of the late
eighteenth and early nineteenth centuries:

> If there should happen any uncommon injury, or infringement of the
> rights before mentioned, which the ordinary course of law is too
> defective to reach, there still remains a fourth subordinate right,
> appertaining to every individual, namely, the right of petitioning the
> king, or either house of parliament, for the redress of grievances.
> In Russia we are told that the czar Peter established a law, that no
> subject might petition the throne till he had first petitioned two
> different ministers of state. In case he obtained justice from
> neither, he might then present a third petition to the prince; but
> upon pain of death, if found to be in the wrong: the consequence of
> which was, that no one dared to offer such third petition; and
> grievances seldom falling under the notice of the sovereign, he had
> little opportunity to redress them.  The restrictions, for some there
> are, which are laid upon petitioning in England, are of a nature
> extremely different; and, while they promote the spirit of peace, they
> are no check upon that of liberty.  Care only must be taken, lest,
> under the pretence of petitioning, the subject be guilty of any riot
> or tumult, as happened in the opening of the memorable parliament in
> 1640: and, to prevent this, it is provided by the statute 13 Car. II.
> st. I, C. 5, that no petition to the king, or either house of
> parliament, for any alteration in church or state, shall be signed by
> above twenty persons, unless the matter thereof be approved by three
> justices of the peace, or the major part of the grand jury in the
> country; and in London by the lord mayor, aldermen, and common
> council: nor shall any petition be presented by more than ten persons
> at a time.  But, under these regulations, it is declared by the
> statute I W. and M. st. 2, c. 2, that the subject hath a right to
> petition; and that all commitments and prosecutions for such
> petitioning are illegal.

1 William Blackstone, Commentaries *143.

Congress charged with implementing America's new Constitution submitted to the stat[e]

ratification, proposed amendments to that Constitution permanently establishing in

American law the right of petition and other fundamental rights.  There is no persu[asive]

reason for the right of petition to mean less today than it was intended to mean in

England three centuries ago.

On remand, the district court should consider which, if any, of San Filip[po's]

grievances and lawsuits constituted a "petition," and whether any such "petition" w[as a]

sham.  The mere act of filing a non-sham petition is not a constitutionally permiss[ible]

ground for discharge of a public employee.

B.        Substantial factor

Our decision to vacate the grant of summary judgment on San Filippo's fir[st]

amendment claim also requires us to consider Rutgers' argument that, contrary to th[e]

district court's conclusion, it was entitled to summary judgment because San Filipp[o]

cannot show that his protected conduct "was a substantial factor in the alleged

retaliatory action."  Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983).

The district court explained that courts have drawn an inference of retal[iation]

based on the nearness in time between the protected activity and a discharge.  Alth[ough]

the district court believed that no fact-finder could reasonably infer that San Fil[ippo's]

protected activities in 1977-1979 and 1983-84 were a substantial factor motivating [his]

dismissal, the court concluded that San Filippo was brought up on charges and dismi[ssed]

36

sufficiently soon after he made protected statements in or around 1986[0] to raise an

inference of retaliation.[0]

At the outset, we disagree with the district court's view that San Filipp

protected activities in 1977-79 and 1983-84 were too far removed in time to support

inference of retaliation. Although a dismissal that occurs years after protected a

might not ordinarily support an inference of retaliation, where, as here, a plainti

engages in subsequent protected activity and the plaintiff is dismissed shortly aft

final episode of such protected activity, a fact-finder may reasonably infer that i

the aggregate of the protected activities that led to retaliatory dismissal. This

inference would be particularly strong if the plaintiff can show that the decisionm

lacked a pretext on which to dismiss the plaintiff until shortly before the time of

dismissal.

Rutgers argues that the temporal proximity between San Filippo's protecte

activities and the disciplinary proceedings against him cannot, by itself, support

inference that the protected activity was a substantial factor in the alleged retal

action. We need not address this argument, however, because San Filippo has additi

evidence to support his allegation that he was dismissed in retaliation for his pro

activity. The evidence described above as support for San Filippo's position that

would not have been dismissed absent his protected activities -- the statements of

Edelstein and Board of Governors member Wechsler and the evidence that other facult

members committed infractions of comparable seriousness yet went unpunished -- equa

support his position that his protected conduct was a substantial factor motivating

[0]The court presumably was referring to San Filippo's disputes with senior members o
department over their efforts to obtain "inappropriate percentages" of his federal
and particularly his complaint to the University in October, 1985 about the chemist
department's attempts to divert funds improperly from his federal grants under the
of a "shop-user's fee." See page 5, supra. San Filippo was orally informed of the
charges against him in November, 1985.
[0]The activities found by the district court to address matters of public concern ar
described briefly at note 13, supra.

dismissal.  On the basis of this evidence, we conclude that a fact-finder could rea

find that San Filippo's protected conduct was a substantial factor motivating his

dismissal.

Rutgers next argues that San Filippo is inappropriately

seeking to impute to the members of the Board of Governors the improper motives of

responsible for bringing charges against him.  Rutgers contends that, under <u>Monell</u>

<u>Department of Social Services</u>, 436 U.S. 658 (1978) and <u>St. Louis v. Praprotnik</u>, 485

112, 123 (1988), the University can only be held liable if the Board members person

determined to dismiss San Filippo on the basis of his first amendment activities or

knowingly acquiesced in the decision to do so by approving both the decision and th

allegedly improper basis for it.  But this, according to San Filippo, is too narrow

standard of liability: in San Filippo's view, the University should be held liable

fact-finder concludes that (a) the charges against San Filippo were initiated in

retaliation for the exercise of his first amendment rights and (b) the Board member

"deliberately indifferent" to that fact.

In <u>Monell</u>, the Supreme Court held that, although municipalities and other

governing bodies can be sued under 42 U.S.C. §1983, liability cannot be imposed on

entity on a theory of vicarious liability for the torts of the entity's employees.

Rather, a local governing body can be held liable only for an official policy or cu

<u>See</u> <u>Monell</u>, 436 U.S. at 694.  A single decision by a final policy-maker, as defined

state law, may constitute official policy.  <u>See</u> <u>Pembaur v. City of Cincinnati</u>, 475

469, 480-81 (1986).  Rutgers argues that the Board of Governors is the only final p

maker in this case, and that the Board did not have a retaliatory motive when it vo

dismiss San Filippo.

San Filippo contends that he need only show that the Board members were

"deliberately indifferent" to the fact that he had been brought up on charges in

retaliation for the exercise of his first amendment rights.  He relies on <u>City of C</u>

38

Ohio v. Harris, 489 U.S. 378 (1989), in which the Supreme Court held that Canton's

to train police officers to give medical attention could be a basis for imposing §1

liability if "the failure to train amount[ed] to deliberate indifference to the rig

persons with whom the police [came] into contact."  Id. at 388.  The Canton Court

explained that the use of the deliberate indifference standard was most consistent

the Court's "admonition in Monell that a municipality can be liable under §1983 onl

its policies are the 'moving force [behind] the constitutional violation.'"  Id. at

(citations omitted).

The Tenth Circuit extended Canton to a situation analogous to the case at

Ware v. Unified School Dist. No. 492, 902 F.2d 815 (10th Cir. 1990).  The plaintiff

Ware served as clerk to a school board and secretary to the superintendent of the s

district.  She alleged that her superintendent had recommended to the board that sh

dismissed in retaliation for her protected speech, and that the board had acted wit

deliberate indifference to her first amendment rights in approving the termination.

Ware court rejected the board's argument that Canton be limited to its facts, and h

> There is evidence in the record to support Ware's claim that the Boa
> acted with deliberate indifference to her First Amendment rights in appro
> her termination. . . .  The record contains evidence that board members k
> about Ware's public stand on the bond issue and were informed of her beli
> her termination was in retaliation for that stand. . . . Notwithstanding
> above indications that the board knew [the superintendent's] recommendati
> in retaliation for Ware's position on the bond issue, the board made no
> independent investigation, asked [the superintendent] no questions about
> reasons for his decision. . . .  The evidence is sufficient to create a j
> question on whether the board acted with deliberate indifference to Ware'
> Amendment rights in approving [the superintendent's] recommendation.

Id. at 819-20.

We agree with the Tenth Circuit that its application of the deliberate

indifference standard of Canton is most consistent with the "'admonition in Monell

municipality can be liable under §1983 only where its policies are the moving force

[behind] the constitutional violation.'" Ware, 902 F.2d at 819 (quoting Canton, 48[9 U.S.] at 388-89) (citations omitted). Nor is this use of the deliberate indifference sta[ndard] inconsistent with City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (plural[ity] opinion). Praprotnik recognized that final decision-making power may be delegated, [and] that a local governing body may be held liable based upon the exercise of this dele[gated] power. See id. at 124. But the Court added:

> Simply going along with discretionary decisions made by one's subordinate[s,] however, is not a delegation to them of the authority to make policy. It [is] equally consistent with a presumption that the subordinates are faithfull[y] attempting to comply with the policies that are supposed to guide them. [It] would be a different matter if a particular decision by a subordinate was [cast] in the form of a policy statement and expressly approved by the supervis[ing] policymaker. It would also be a different matter if a series of decision[s by a] subordinate official manifested a "custom or usage" of which the supervis[or must] have been aware. . . . But the mere failure to investigate the basis of [a] subordinate's discretionary decisions does not amount to a delegation of [final] policymaking authority, especially where (as here) the wrongfulness of th[e] subordinate's decision arises from a retaliatory motive or other unstated [ ] rationale.

Id. at 130. In addition to holding that the "mere failure to investigate the basis [of a] subordinate's discretionary decisions" does not make the subordinate a final policy[maker,] the

Praprotnik Court also implicitly held that the local governing body is not liable f[or a] mere failure to investigate by the final policy-maker.

Our use of a "deliberate indifference" standard does not make the Univers[ity] liable for the Board's mere failure to investigate -- that is, the University would [not be] liable if, oblivious to the motivation behind the decision to charge San Filippo ar[d] initiate dismissal proceedings, the Board had decided to dismiss San Filippo for wh[at were] legitimate reasons. Such a scenario would not amount to deliberate indifference of [the] Board to San Filippo's first amendment rights. The scenario described by San Filip[po,] however, goes beyond that of an oblivious Board failing to investigate.

40

San Filippo presented to the district court evidence that the Board had r

to suspect that San Filippo's prior protected activities had been a substantial mot

factor in the decision to initiate dismissal proceedings. As the magistrate judge

"the record is replete with evidence which indicates that the information regarding

Filippo's protected activities was well known to the individual members of the Boar

(A.2152 n.15). Moreover, Wechsler's dissenting opinion discloses awareness at the

of the Board of San Filippo's contention before the Senate Panel that other faculty

members had had students perform uncompensated work for them, yet were not discipli

(A.325). Finally, the Board's opinion recognizes that San Filippo's attorney, Ira

Goldberg, had argued that "the charges brought against Professor San Filippo were

fabrications based on a personal 'vendetta' against him by members of his Departmen

(A.304). As in Ware, this evidence suffices to create a question for the fact-find

regarding whether the ultimate decision-maker acted with deliberate indifference to

plaintiff's first amendment rights by approving the recommendation that the plainti

dismissed.[0]

---

[0]The Supreme Court's recent decision in Waters v. Churchill, 62 U.S.L.W. 4397 (May
1994) provides additional support for our use of the Canton "deliberate indifferenc
standard in the case at bar. In Waters, the Court addressed the question whether t
Connick test should be applied to what the government employer thought the employee
or to what the fact-finder ultimately determines was said. The Court took an inter
position, holding that a court should accept the employer's factual conclusions, bu
if the employer was reasonable in arriving at those conclusions. Id. at 4401-02.
elaborating on what would constitute reasonable conduct by an employer, the Court
explained:

If an employment action is based upon what an employee supposedly sa
a reasonable supervisor would recognize that there is a substantial likel
that what was actually said was protected, the manager must tread with a
amount of care. This need not be the care with which trials, with their
of evidence and procedure, are conducted. It should, however, be the car
a reasonable manager would use before making an employment decision --
discharge, suspension, reprimand, or whatever else -- of the sort involve
the particular case. Justice Scalia correctly points out that such care
normally constitutionally required unless the employee has a protected pr
interest in her job, but we believe that the possibility of inadvertently

41

**III.         San Filippo's procedural due process claim**

San Filippo also asks us to vacate the district court's grant of summary

judgment on his procedural due process claim. San Filippo argues that his due proce

rights were violated because the five members of the Senate Panel that conducted th

hearings and recommended that he be dismissed were not impartial decision-makers an

because the proceeding was tainted by the appearance of impropriety.  Specifically,

Filippo alleges in his Third Amended Complaint:

> [The] members of the panel were negotiating with the Rutgers Administrato
> chiefly responsible for supervising the prosecution of the case for addit
> compensation, thus giving them a financial incentive in the outcome of th
> proceedings, in that they reasonably would believe that they would get
> additional compensation only if their final decision was favorable to the
> Administrator.  Furthermore, all the contacts for such additional compens
> were held in secret, thus leading to the appearance of impropriety on the
> of the Panel.

Both the magistrate judge and the district court rejected San Filippo's argument th

fact-finder could reasonably infer that the panel members believed they were more l

to be compensated if they recommended that San Filippo be dismissed. In addition, t

magistrate judge and district court rejected San Filippo's argument that the "secre

negotiations about compensation created an appearance of impropriety.  We agree wit

conclusions reached by the magistrate judge and district court.

The Senate Panel was composed of five faculty members, chosen by lot afte

cause and peremptory challenges, whose responsibility was to hold hearings and dete

---

> punishing someone for exercising her First Amendment rights makes such ca
> necessary.

Id. at 4402.  By holding that the University may be held liable if a fact-finder fi
that the Board of Governors was deliberately indifferent to the possibility that di
proceedings were initiated against San Filippo in retaliation for the exercise of h
first amendment rights, we similarly require his employer to "tread with a certain
of care" to avoid "the possibility of inadvertently punishing someone for exercisin
First Amendment rights."

whether the charges brought against San Filippo were true and constituted grounds f

dismissal.  The panel had twelve meetings after it convened on December 5, 1986 and

the evidentiary hearings began.  Between March 24, 1987 and September 22, 1987, the

devoted forty-six days to evidentiary hearings.  After closing arguments, the panel

another twelve meetings before it produced a forty-four page report on December 21,

Throughout the hearings, San Filippo was represented by two attorneys, Ira and Pame

Goldberg, and a union counsellor provided by the Rutgers AAUP, Dr. Wells Keddie.

With the knowledge and consent of San Filippo's attorneys, Dr. Keddie, on

5, 1987, sent a memorandum to the panel chair, Dr. Szatrowski, copied to San Filipp

his attorneys.  The memorandum suggested various ways to deal with time and schedul

problems:

> I don't have a single original or good idea as to how to resolve the time
> but there are some things which might mitigate the impact upon the commit
> members.  One of them is the course you are already pursuing, the seeking
> some relief from normal duties while this demanding activity proceeds.
> to me that if the proceedings cannot be concluded by the May 15 date, it
> be entirely appropriate to request the equivalent of Summer Session pay f
> of you or released time for those of you (yourself) on "summer vacation"
> upcoming trimester.  But another possibility might well be worth consider
> released time <u>after</u> this is all over to enable committee members to make
> considerable lost time, energy, and opportunity.

Dr. Keddie also suggested that panel members "be provided meals and accommodations.

When it became clear that the hearings would not conclude before commence

Szatrowski asked San Filippo's attorney, Ira Goldberg, if he had any objection to

Szatrowski asking Dr. Susan Cole, Vice President for University Administration and

Personnel, for summer compensation for the panel members.  Szatrowski and Goldberg

testified in their affidavits that Goldberg voiced no objection and wished Szatrows

"good luck."

When Szatrowski first requested additional compensation and/or released t

the spring of 1987, Cole denied the request because she believed that the panel mem

43

were already under an obligation to participate without extra compensation. In late

spring, Szatrowski renewed the request in light of the length of the hearings and t

that certain panel members were ordinarily not required to be in attendance at Rutg

over the summer.  By letters dated July 29, 1987, Cole granted the members their re

extra compensation and release time.  San Filippo was not told of this decision.

Shortly after the summer increases were granted, Szatrowski asked Cole fo

further additional compensation when it became clear that the hearings would contin

the fall. Cole testified that when Szatrowski approached her about the matter of fu

payments, she "told him when the panel was finished with its business, that we coul

discuss the matter again."  Szatrowski similarly testified:

> When I asked if this [the refusal to grant more compensation] meant that
> regardless of the amount of additional time spent on this matter by the
> panelists while carrying out their normal duties, there would be no furth
> consideration for additional compensation in the future, Dr. Cole indicat
> there would be no consideration possible until after the completion of th
> hearings.

Ultimately, after the panel issued its final report recommending that San Filippo k

dismissed, Cole recommended that the panel members receive extra compensation.

Based upon this factual scenario, San Filippo alleges that the panel memk

would have been tempted to reach an outcome in Rutgers' favor because they would ha

believed that they were more likely to get extra compensation if they did so. We ag

with the magistrate judge and district court that there is insufficient evidence to

support an inference that the faculty members believed that their receipt of compen

was tied to the outcome of the proceedings.  The cases cited by San Filippo are cas

which the adjudicator had a direct financial interest in the outcome.  See, e.g., _

Ohio, 273 U.S. 510, 531 (1927) (mayor acting as judge shared in the fees and costs

by him); Ward v. Village of Monroeville, 409 U.S. 57, 60 (1972) (mayor responsible

village finances could not act as judge when fines and forfeitures provided substan

44

portion of village funds).  The Supreme Court has held that the impermissible pecun

interest must be realistic and more than "remote."  <u>Marshall v. Jerrico, Inc.</u>, 446

238, 250 (1980). We find no evidence in the record to support a conclusion that the

members believed that they were more likely to be compensated if they recommended S

Filippo's dismissal.

San Filippo alternatively argues that the panel members' participation in

hearings while negotiating for additional compensation created an appearance of

impropriety. <u>See</u> <u>Commonwealth Coatings Corp. v. Continental Casualty Co.</u>, 393 U.S.

150 (1968) (arbitration panel "not only must be unbiased but must also avoid the

appearance of bias").  Under <u>Commonwealth Coatings</u>, to prevail on an "appearance of

impropriety" due process claim, San Filippo must establish both that the events in

question would cause one to reasonably question the panel's impartiality and that t

information was concealed from San Filippo.  San Filippo makes much of the fact tha

was not told about the meetings between Szatrowski and Cole; however, in light of t

that Keddie suggested that Szatrowski broach the subject of extra compensation, the

meetings do not have the invidious character San Filippo suggests.

Finally, San Filippo argues that he should have had the opportunity to de

Szatrowski to determine what was said in the conversations between Szatrowski and C

San Filippo contends that, although he noticed Szatrowski's deposition in August 19

discovery was stayed after November 1989 when the motions for summary judgment were

As the district court noted, San Filippo has failed to explain why Szatrowski was n

deposed before August 1989 -- particularly, why he was not deposed during the summe

fall of 1989 when San Filippo deposed nine other current and former officials and

employees of Rutgers.  Moreover, San Filippo does not indicate how he expects the

deposition testimony of Szatrowski to differ from the testimony found in Szatrowski

affidavit, dated April 2, 1990. For these reasons, we conclude that the district co

45

not abuse its discretion by refusing to delay decision on the summary judgment moti until San Filippo had a chance to depose Szatrowski.

**IV.      Conclusion**

For the foregoing reasons, we affirm in part and vacate in part the order district court.  We affirm the district court's grant of summary judgment in Rutger favor on San Filippo's due process claim.  We vacate the district court's grant of judgment in Rutgers' favor on San Filippo's first amendment claim, and remand for proceedings consistent with this opinion.

46

Joseph San Filippo, Jr. v. Michael Bongiovanni; Anthony S. Cicatiello; Adrienne S. Anderson; Donald M. Dickerson; Floyd H. Bragg; Norman Reitman, individually and as of the Board of Governors of Rutgers University; RUTGERS, THE STATE UNIVERSITY, No. 5658

BECKER, Circuit Judge, concurring and dissenting.

While I agree with almost all of the majority opinion, I cannot join in conclusion to Part IIA, pages 42 to 47, holding that a public employee is protected the Petition Clause against retaliation for having filed a petition (in the nature lawsuit or grievance) addressing a matter of purely private concern. I would adopt position of the seven other circuits which hold that a public employee plaintiff wh "petitioned" is in no better position than one who has merely exercised free speech Majority Typescript at 37 n.19 (listing circuits).

I need not offer extended justification for my position, for the majority already done so when describing these other circuits' views at pages 24 to 41 of it opinion. Although the majority then arrives at a conclusion in contradistinction to preceding analysis, the majority's rationale supporting its conclusion pales by com with the reasoning of the other circuits and with the inexorable logic of McDonald Smith. 472 U.S. 479 (1985). In a nutshell, I simply do not believe that the fact the government adopts a formal redress mechanism gives one who pursues it more prot than if the person had written a letter to the editor or made a speech. As the Sup Court explained in McDonald:

> The Petition Clause . . . was inspired by the same ideals of liberty
> and democracy that gave us the freedoms to speak, publish, and
> assemble. These First Amendment rights are inseparable, and there is
> no sound basis for granting greater constitutional protection to
> statements made in a petition to the President than other First
> Amendment expressions.

472 U.S. at 484-85. The same holds true when the petition is addressed to the cour to university officials.

47

In my view, the Supreme Court would be surprised to learn that, althoug

result of "the nature of the government's mission as employer," a public employer (

Rutgers) can fire someone who "begins to say or do things that detract from the age

effective operation" so long as the speech is on a matter of private concern, Water

Churchill, 62 U.S.L.W. 4397, 4401 (May 31, 1994) (quoted in Majority Typescript at

the government cannot fire the same individual if he or she speaks after invoking a

mechanism for the redress of grievances (or speaks through that forum).  Such an

interpretation of the Petition Clause, rather than making that clause a "trap for t

unwary" as the majority contends would be the consequence of my interpretation of t

Clause, Majority Typescript at 44, is an invitation to the wary to formulate their

on matters of private concern as a lawsuit or grievance in order to avoid being

disciplined.  This would undermine the government's special role as an employer.

The majority argues that in contrast to speech on a matter of private con

"when one files a `petition' one is not appealing over government's head to the gen

citizenry: when one files a `petition' one is addressing government and asking gove

to repair what government has broken, or, at least, has failed to repair."  Majorit

Typescript at 43.  But the libelous letter to the President at issue in McDonald, 4

at 484-85, took the form of an address to government rather than the general citize

and yet the Court held that the letter received no greater constitutional protectio

result. And the fact that San Filippo's speech addressed government did not make it

less disruptive of the workplace environment than if it had addressed the general p

indeed, the speech may have been more disruptive because it still reached the publi

(lawsuits, for example, are matters of public record) and, in addition, compelled t

university to respond to the lawsuits and grievances.

The majority argues that it would undermine the Constitution's purposes t

government to punish someone for invoking a mechanism to which government has given

constitutional imprimatur."  Majority Typescript at 42.  However, the constitutiona

48

imprimatur of the Petition Clause applies equally to the letter to the President at

in McDonald as to the lawsuits and grievances at issue here.  By waiving sovereign

immunity to suit or adopting grievance procedures, the government may give special

statutory/regulatory imprimatur to these mechanisms as opposed to other forms of pe

such as letters, but it does not give them a special constitutional imprimatur.  Mo

the government has given its regulatory imprimatur to the letter at issue in McDona

setting up an office in the White House that is designed to respond to corresponden

Finally, for lawsuits at least, the state's waiver of sovereign immunity is not spe

to suits by public employees and thus may not be at all meant as a recognition of a

employee's right to file repeated lawsuits against his or her employer.

Nor, by adopting such petition mechanisms, does the government somehow in

the employee's interest in having free license to protest his or her employer's dec

For example, San Filippo would have had the same interest in protesting the failure

chemistry department to recommend him for a full professorship if the university ha

adopted a grievance procedure.  Connick declares that this interest is outweighed b

university's interest in regulating its work environment.

Finally, the majority's suggestion that a contrary interpretation would r

the Petition Clause a "dead letter" is hyperbolic.  Inter alia, the clause would st

have use when there is a "petition," in lieu of more conventional speech. Moreover,

if all petitions now constitute speech (given the broad interpretation the Supreme

has given to speech), I do not see why it matters that the guarantees overlap.  The

certainly petitions that did not constitute speech when the First Amendment was rat

meaning that the two clauses were not redundant when initially adopted.  In additio

First Amendment's guarantees of free speech and a free press also substantially ove

See Laurence H. Tribe, American Constitutional Law, § 12-22, at 971 & nn. 2-3 (2d e

1988).  Cf. Branzburg v. Hayes, 408 U.S. 665, 684 (1972) ("It has generally been he

the First Amendment does not guarantee the press a constitutional right of special

49

information not available to the public generally.")  At least the Petition Clause

the function of emphasizing that freedom to petition <u>the government</u> directly is an

important part of freedom of speech and prevents courts from deleting the petition

As the Supreme Court stated in <u>McDonald</u>, the right to petition "is an assurance of

particular freedom of expression."  472 U.S. at 484-85.  Thus, the majority's "dead

letter" argument cannot carry the day.